GRIMES, Acting Chief Judge.
This appeal turns upon the construction of certain agreements concerning the exploitation of an invention.
In 1967, John F. Roesel, the inventor of an electric generator and the owner of patents thereon, entered into an agreement (1967 agreement) under which Rohe Meyer acquired a 10% interest in the invention in consideration of his legal services rendered as a patent attorney concerning the invention. The agreement recited that the “sale is a sale of a ten percent (10%) interest to all rights in said invention, including the right to make, use and sell same.” The agreement further provided that if Meyer should sell or attempt to sell or otherwise dispose of any rights obtained under the agreement without Roesel’s written consent, Roesel would have the option of reacquiring all of the rights transferred to Meyer. In such event, “all consideration advanced” by Meyer to Roesel as payment would be returned. Although there was no prohibition against the rights in the invention passing by will or descent, the agreement specifically provided that in the event of death, it would be binding upon the decedent’s heirs or beneficiaries and that Roesel would have the same option of reacquisition against them if they should sell or attempt to sell or dispose of “any rights granted hereunder” without his consent.
The 1967 agreement also provided that if Roesel should negotiate a sale with a third party and Meyer refuse to join in the sale with respect to his interest in the invention, Roesel would again have a right to reacquire all of his rights transferred under the agreement. In this instance, however, Roesel would be obligated to return the consideration plus interest at 6%.
Roesel sold similar interests in the invention to other individuals and corporations. On November 1, 1968, all of the owners of interests in the invention (including Roesel and Meyer) as “sellers” entered into a sales agreement with Jebco, Inc. (1968 agreement). The 1968 agreement transferred to Jebco all rights to the invention in the following language:
NOW, THEREFORE, Sellers hereby sell, assign, transfer and deliver said inventions, patent applications and all rights (including without limitation the rights to use, sell and manufacture) in and to said inventions and patent applications and patents issuing thereon as well as any further modifications, improvements, or adaptations of said inventions and patent rights thereon, in the United States and all foreign countries....
Under the agreement Jebco was given the right to sell, assign or license in the United States and all foreign countries “any portion of or all rights in and to said inventions.” There was no requirement that Jebco obtain the consent of Roesel before it could sell any interest in the inventions and no restraints on Jebco alienating any interest that it received. Jebco agreed to transfer to the “sellers” 25,000 shares of its common stock and to make certain minimum payments to the sellers during the term of the agreement calculated upon a percentage of the monies derived by Jebco from the use of the invention. If the payments were not made, the holders of the majority interest of “seller’s rights under this agreement,” would have the right “to recover” said invention and patent rights. Jebco also had the right to terminate the agreement and thereby relieve itself from the obligation to make further payments in *446 which event Jebco would reassign all rights to the invention to the sellers.
In the early 1970’s, Jebco sold the invention to Precise Power Corporation (Precise), and a formal assignment was recorded in the United States Patent Office. Precise assigned back to Jebco “the entire interest” in the patents for the invention as security for the unpaid purchase price. Subsequently, Jebco reassigned “the entire interest” in the patents back to Precise.
Rohe Meyer died in 1978 and Marie G. Meyer was appointed personal representative of his estate. Sometime in 1980, Roe-sel, Jebco and other parties, including the personal representative, executed an “assignment” that recited as follows:
Roesel, Jebco and the other parties whose signatures are affixed below wish to evidence by this agreement the vesting of all rights of ownership in and to said patents in Precise Power Corporation, as a matter of record in the U.S. Patent Office; [and by such assignment did] ... sell, assign and transfer unto Precise Power Corporation the full and exclusive right for the territory of the United States of America, and for all foreign countries in and to said Letters Patent....
The signatories, including the personal representative, assigned unto Precise “all their interest in” any other inventions constituting modifications, improvements or adaptations of said inventions.
On May 15, 1980, Precise, Roesel, the personal representative and others entered into another agreement wherein Roesel, the personal representative and others were referred to as “backers” (1980 agreement). This agreement confirmed the provisions and recitals in the previous agreements by again reciting the following:
[On] November 1, 1968, ... Backers did sell and assign as owners their entire right and interest in certain letters patent, including future inventions ... [to Jebco and that] ... by an agreement dated August 20, 1974, and other agreements and assignments dated prior to August 20, 1974, Jebco did assign its entire interest in said Letters Patent to Precise subject to the terms and conditions of the Sales Agreement of November 1, 1968.
The 1980 agreement further recited that The Continental Group, Inc., had offered to purchase an option for a license for the letters patent from Precise. It provided that upon certain approvals and the exercise of the option by Continental, the personal representative and the other backers would not declare a default under the 1968 agreement and would modify the amounts due them under such agreement. The payments due from Continental were to be made to a “trustee.” Thereafter, Continental exercised its option under the 1980 agreement and began making payments to the law firm of Kirk, Pinkerton, Savary, Carr and Strode, as trustee.
On June 26, 1980, Charles E. Early, the attorney for the personal representative, mailed a letter to certain backers, including Roesel and his attorney, stating that the estate was interested in selling its Jebco stock and its interests as a backer and invited a submission of a purchase offer. Roesel took the position that Early’s letter constituted an attempt to sell the rights acquired by Meyer in the 1967 agreement in violation of the provisions of that agreement. Roesel brought suit against the personal representative to declare a forfeiture of her rights in the invention. Roesel joined the trustee as a defendant seeking to obtain the monies held by the trustee which were payable to the personal representative under the 1968 agreement. The personal representative counterclaimed for a determination that she could sell her interest in the 1967 agreement free of the right of reacquisition by Roesel. The personal representative also filed a cross-claim against the trustee for her share of the Continental payments held by the trustee. According to expert witnesses who testified at the nonjury trial, the value of Meyer’s legal services to Roesel concerning the invention did not exceed $500, and this was the amount that Roesel sought to pay for reacquisition of the personal representa *447 tive’s rights under the 1967 agreement. The 1967 agreement had been drawn by Roesel’s personal attorney rather than by Meyer.
In the amended final judgment, the court held that all of the provisions of the 1967 agreement were fully binding upon the parties but Early’s letter concerning the possible sale of the personal representative’s interest did not constitute a breach of the agreement. Hence, the court ruled against Roesel on his complaint seeking reacquisition of the invention and also ruled against the personal representative on her counterclaim. The court further held that it did not have jurisdiction over the trustee on the cross-claim because even though the trustee had been served by mail with a copy of the cross-claim, there had been no personal service through the vehicle of a cross-claim summons.
The personal representative argues that the 1968 agreement constituted a sale of the invention by all of its owners, thereby rendering the restriction against attempted sale contained in the 1967 agreement no longer applicable. The personal representative further contends that if the 1967 restriction is construed to prevent her from attempting to sell her residual interest under the 1967 agreement, such a restriction would constitute an illegal restraint on alienation. Roesel points out that the restriction against the attempted sale of the invention was essential to the 1967 agreement because 35 U.S.C.A. § 262 (1984), permits each co-owner to make, use or sell a patented invention without accounting to the other co-owners. He insists that the 1968 agreement was merely a license to use the invention and that the restrictions of the 1967 agreement remain fully binding upon the personal representative.
Upon consideration, we hold that the 1968 agreement constituted a sale of the invention of Jebco. The only language in the 1968 agreement that supports Roe-sel’s argument is an isolated reference to “the license hereby granted” which is contained in the patent infringement hold harmless clause. In all other respects, the agreement characterizes the transaction as a sale. Moreover, the 1980 agreement signed by Roesel and the personal representative confirmed that by the 1968 agreement, the backers (such as Meyer) had sold and assigned their “entire right and interest in” the patents and that by certain other agreement and assignments, Jebco had assigned its “entire interest in” the patents to Precise. Thus, it is clear that the personal representative does not now have any interest or right in the invention or the patents. The only rights the personal representative now has are the contract rights specified in the 1968 agreement, which consist of the right to receive certain money payments and the right to recover the invention and the patents upon certain defaults. See Willingham v. Lawton, 555 F.2d 1340 (6th Cir.1977) (reservation of right to reassignment of patent to assignor if assignee fails to make required payments does not convert assignment into a license).
The personal representative is in much the same posture as one who sells land and takes back a mortgage. Rather than continuing to own an interest in the land, he merely owns a chose in action. Shavers v. Duval County, 73 So.2d 684 (Fla.1954). The fact that he may reacquire the land upon default does not serve to make him an owner of an interest in the land until that event takes place.
We then look to the 1967 agreement to see whether it prohibited the personal representative from selling the residual interests which she now retains. The 1967 agreement conveyed to Meyer “rights in said invention.” The restriction on alienation related to the sale of or the attempt to sell any “rights granted to him hereunder,” to wit: the sale or attempted sale of rights or interests “in” the invention. The repeated references to the rights “hereunder” and the rights “in” the invention suggest that there was no intent that the restraint on alienation would cover whatever interest Meyer might sometime in the future receive in exchange for a sale of his right “in” the invention. Moreover, the *448 justification for restricting an owner’s ability to sell bis interest in an invention without the consent of his co-owner no longer exists when the invention has been sold. Thus, we construe the 1967 agreement as containing no restriction against the sale of the personal representative’s right to receive payments for the sale of the invention and the right to recover an interest in the invention upon default. Therefore, we need not reach the personal representative’s argument that the restriction constituted an illegal restraint on alienation. Our holding also renders moot the cross-appeal because regardless of whether Early’s efforts constituted an attempt to sell the personal representative’s residual interests, there was no restriction against such a sale. However, this opinion should not be construed to suggest that the restriction against the sale of the invention might not once again be applicable if the personal representative or her successor should reacquire an interest in the invention upon default pursuant to the provisions of the 1968 agreement.
The remaining issue is the court’s finding that it had no jurisdiction over the trustee with respect to the personal representative's cross-claim. Two of our sister courts have held that jurisdiction over a cross-elaim defendant must be obtained by personal service of a cross-claim summons. Elliott Enterprises, Inc. v. Serota, 436 So.2d 415 (Fla.3d DCA 1983); Fundaro v. Canadiana Corp., 409 So.2d 1099 (Fla. 4th DCA 1982). However, if a party takes some step in the proceeding or files a pleading to the merits of the cause, defects in service or jurisdictional defects are Waived. Sternberg v. Sternberg, 139 Fla. 219, 190 So. 486 (1939). Here, subsequent to service of the cross-claim by mail, there was filed in these proceedings a written stipulation entered into by all parties in which the trustee agreed to hold the funds in escrow and make distribution in accordance with court order. Since the trustee’s only interest in this suit was that of a stakeholder, we believe that the filing of this stipulation constituted the trustee’s acceptance of the court’s jurisdiction without the necessity of the service of a cross-claim summons.
The final judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.
SCHOONOVER and HALL, JJ., concur.